2014 SEP 22 AM 10: 35


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70808-2-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| GILDARDO ZALDIVAR-GUILLEN, | ) | UNPUBLISHED |
| | ) | |
| Appellant. | ) | FILED: September 22, 2014 |
| | ) | |

Cox, J. — A jury convicted Gildardo Zaldivar-Guillen of commercial sex abuse of a minor. He appeals and contends that the trial court abused its discretion in admitting his incriminating statements to a law enforcement officer. He also claims that he was deprived of the effective assistance of counsel because trial counsel failed to file a motion to suppress evidence challenging the legality of the investigatory stop. He further contends that the evidence does not support his conviction. Because there is no error, we affirm.

Around 10:00 p.m. on August 3, 2012, Detective Donyelle Frazier responded to a call from another officer who had been watching a young female on Pacific Highway South in the City of SeaTac and suspected she was engaging in prostitution. Detective Frazier and two other law enforcement officers parked their unmarked police vehicles nearby to observe the young woman. The woman was initially in the parking lot of a donut shop, then moved to a bus stop and sat down. After the first officer who was watching the woman

drove away in his marked police vehicle, the woman stood up and walked along the edge of the roadway. She paid "close attention" to passing vehicles and tried to look into the vehicles to make eye contact with occupants.

A red pick-up truck pulled up along the side of the bus stop and the young woman, later identified as Z.B., immediately got in. The driver drove on the highway and then pulled into a dark parking lot outside of a closed business. The driver parked and turned off the truck's lights. Detective Frazier and the other officers followed the truck and parked nearby. When no one got out of the truck after three or four minutes, the officers approached the truck.

Detective Frazier approached the driver, later identified as Gildardo Zaldivar-Guillen. Detective Frazier asked Zaldivar-Guillen to step out of the truck and he complied. Zaldivar-Guillen was wearing shorts, and the Detective noticed that he had an erection. After Detective Frazier advised Zaldivar-Guillen of his Miranda[1] rights, Zaldivar-Guillen told the officer that Z.B. was a friend he had known for two months and he was driving her home. He could not then explain why he took Z.B. to a closed business, not a home. Detective Frazier, who recognized Z.B. as a prostitute from previous contacts, told Zaldivar-Guillen that he knew Z.B. was a prostitute. Zaldivar-Guillen then admitted that he picked Z.B. up knowing she was a prostitute, that he touched her breasts while they drove to prove he was not a police officer, and they "talked about sex, but they did not have enough time to talk about the price." Zaldivar-Guillen also said that Z.B. told him she was "dating" or "working" and told Detective Frazier that although he

---

[1] Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

would find money on the dash of his truck, he had not offered Z.B. any money in exchange for sex.

The State charged Zaldivar-Guillen with commercial sex abuse of a minor and attempted commercial sex abuse of a minor. At trial, the evidence established and the parties also stipulated that Z.B. was 17 years-old at the time of the August 2012 incident. Z.B. testified at trial and said Zaldivar-Guillen was only giving her a ride home. But she admitted that, in a statement to the police at the time, she said Zaldivar-Guillen offered her $10 for sex and she told him she needed $60. Zaldivar-Guillen did not testify.

The jury found Zaldivar-Guillen guilty as charged. The court dismissed the attempt count.

Zaldivar-Guillen appeals.

## ADMISSION OF CUSTODIAL STATEMENTS

Zaldivar-Guillen challenges the trial court's ruling that his incriminating statements to Detective Frazier were admissible at trial. He claims that the court improperly concluded that he validly waived his rights under Miranda because he was not advised of those rights in Spanish, his native language. We disagree.

A custodial statement is admissible if police advised the defendant of his constitutional rights and the defendant knowingly, voluntarily, and intelligently waived those rights.[2] A suspect may validly waive his constitutional rights in spite of language difficulties.[3] For example, in State v. Teran, a translation of

---

[2] Miranda, 384 U.S. at 479; State v. Aten, 130 Wn.2d 640, 663, 927 P.2d 210 (1996).
[3] State v. Teran, 71 Wn. App. 668, 672, 862 P.2d 137 (1993), review denied, 123 Wn.2d 1021 (1994).

Miranda warnings into Spanish incorporating the use of a complex, uncommon word did not render the defendant's waiver invalid because there was sufficient evidence that he understood his rights.[4] In determining whether a defendant voluntarily waived Miranda rights, we consider the totality of the circumstances.[5]

A reviewing court will not disturb a trial court's conclusion that a waiver was voluntarily made if the trial court found, by a preponderance of the evidence, that the statements were voluntary and substantial evidence in the record supports the finding.[6] Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding.[7]

Pursuant to CrR 3.5(c), a trial court is required to enter written findings. The record in this case does not include written findings. Nonetheless, the absence of written findings is harmless if the oral ruling is sufficient to permit appellate review.[8] Here, the record is adequate to support our review and neither party argues otherwise.

Based on the testimony presented at the CrR 3.5 hearing, the trial court determined there was "no evidence" that Zaldivar-Guillen did not comprehend English well enough to understand his rights, and to the contrary, the evidence indicated that he did, in fact, understand those rights. The court found that Zaldivar-Guillen's waiver was voluntary, knowing, and intelligent and accordingly concluded that his statements were admissible.

---

[4] Id. at 672-73.
[5] State v. Allen, 63 Wn. App. 623, 626, 821 P.2d 533 (1991).
[6] State v. Athan, 160 Wn.2d 354, 380, 158 P.3d 27 (2007).
[7] State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).
[8] State v. Miller, 92 Wn. App. 693, 703, 964 P.2d 1196 (1998).

The court's findings are supported by Detective Frazier's testimony. Detective Frazier testified that because Zaldivar-Guillen appeared to be Hispanic, he immediately asked whether Zaldivar-Guillen understood English to ensure there was no language barrier. Zaldivar-Guillen confirmed that he spoke English. Detective Frazier then advised Zaldivar-Guillen of his Miranda rights in English. Zaldivar-Guillen expressed no confusion about those rights and waived them. According to Detective Frasier, he and Zaldivar-Guillen conversed for about 10 to 15 minutes and during their conversation, Zaldivar-Guillen spoke coherently, responded appropriately to questions, and did not exhibit any difficulty speaking or understanding English.

The court's finding is also supported by the testimony of Deputy Joel Banks who was also involved in the stop. Deputy Banks described hearing Zaldivar-Guillen and Detective Frazier "speaking back and forth" and there did not appear to be any language barrier. Deputy Banks primarily spoke with Z.B., and testified that Z.B. described her conversation in the truck with Zaldivar-Guillen and did not report any problems communicating with him.

Zaldivar-Guillen did not testify at the CrR 3.5 hearing.

Zaldivar-Guillen relies on State v. Prok,[9] and State v. Morales,[10] to argue that a suspect must be advised of constitutional rights in his or her native language in all cases. Neither case stands for this proposition. In Prok, a state trooper advised Prok, a Cambodian suspect who also appeared to be extremely intoxicated, of his rights in English but never asked Prok whether he understood

---

[9] 107 Wn.2d 153, 727 P.2d 652 (1986).
[10] 173 Wn.2d 560, 269 P.3d 263 (2012).

English, nor did Prok's conduct provide any assurance that he did, in fact, understand.[11] The State admitted this was a violation Prok's right under JCrR 2.11(c)(1) to be advised of the right to an attorney.[12]

In Morales, the suspect ran a stop sign, collided with another car and did not stop until his car became inoperable. After arresting Morales, a trooper transported him to the hospital but did not provide a "308 warning" in English to advise Morales of his right to have additional blood tests administered by someone of his own choosing.[13] Instead, the trooper recruited a hospital interpreter to provide the warning in Spanish. The interpreter did not testify, and because the trooper did not speak Spanish, he could not testify that the hospital employee actually gave the warning to Morales. The court held that the blood test results were erroneously admitted because under these circumstances, the State failed to prove that Morales was provided with the required warning.[14]

Zaldivar-Guillen points to no cases suggesting that a non-native English speaker must be advised of constitutional rights in his or her native tongue to validly waive those rights.[15] And here, while it appears that English is not Zaldivar-Guillen's native language, Zaldivar-Guillen told Detective Frazier that he

---

[11] Prok, 107 Wn.2d at 155.
[12] JCrR 2.11(c)(1) has been replaced by CrRLJ 3.1(c)(1). The same protection is afforded to adult defendants by CrR 3.1(c)(1).
[13] Morales, 173 Wn.2d at 569.
[14] Id.
[15] See e.g. United States v. Crews, 502 F.3d 1130, 1140 (9th Cir. 2007) (valid waiver where suspect advised of his rights in English, indicated he understood the rights and did not require services of a translator); United States v. Bernard S., 795 F.2d 749, 752-53 (9th Cir. 1986) (waiver valid where Apache Indian suspect responded in English that he understood Miranda rights and signed a written waiver but also demonstrated some difficulty with English); Campaneria v. Reid, 891 F.2d 1014 (2nd Cir. 1989) (valid waiver where Spanish-speaking suspect advised of Miranda rights in English only but indicated he understood each of the rights).

understood English and specifically confirmed that he understood his Miranda rights. As the trial court observed, nothing in the record indicates that Zaldivar-Guillen exhibited difficulty understanding or communicating in English. Notwithstanding any language barrier that may exist, substantial evidence supports the trial court's findings that Zaldivar-Guillen was sufficiently fluent in English to understand and voluntarily and intelligently waive his Miranda rights.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Zaldivar-Guillen argues that he was deprived of the effective assistance of trial counsel. He contends that counsel was ineffective for failing to move to suppress incriminating statements on the basis that the warrantless investigatory stop in this case was unlawful.

A criminal defendant has a constitutional right to effective assistance of counsel.[16] In order to prevail on a claim of ineffective assistance of counsel, Zaldivar-Guillen must demonstrate (1) deficient performance and (2) resulting prejudice.[17] If a defendant fails to establish either prong, we need not inquire further.[18] In this case, to establish that his attorney's performance was deficient because he did not move to suppress evidence, Zaldivar-Guillen must show the court would have granted such a motion.[19]

---

[16] Strickland v. Washington, 466 U.S. 668, 685, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[17] Strickland, 466 U.S. at 687; State v. Bowerman, 115 Wn.2d 794, 808, 802 P.2d 116 (1990).

[18] State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

[19] Id. at 79-80; see also State v. Brown, 159 Wn. App. 366, 371, 245 P.3d 776 (2011) (defense counsel has no duty to pursue arguments that appear unlikely to succeed).

Warrantless searches and seizures are per se unreasonable unless one of the few narrowly-drawn exceptions to the warrant requirement applies.[20] An investigatory Terry[21] stop is a well-established exception to the warrant requirement.[22] To be lawful, a Terry stop must be based on "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.'"[23] A reasonable suspicion may be based on "commonsense judgments and inferences about human behavior."[24]

Zaldivar-Guillen contends there were no specific facts giving rise to a reasonable suspicion of criminal activity to justify the investigatory stop. He claims that the police officers knew only that he was present in an area known for prostitution activity, a female got into his car, and they stopped in a parking lot, circumstances that could be consistent with any number of non-criminal activities. Zaldivar-Guillen points out that the police officers did not see money change hands or hear his conversation with Z.B., nor did they observe any sexual conduct between the two. He argues that, as was the case in State v. Diluzio, there were only "incomplete observations" which did not provide a sufficient factual basis to justify stopping and detaining him.[25]

We disagree. In Diluzio, a police officer stopped the defendant's vehicle after seeing that he parked on the side of a road and had a short conversation

---

[20] State v. Ladson, 138 Wn.2d 343, 349, 979 P.2d 833 (1999).
[21] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).
[22] State v. Gatewood, 163 Wn.2d 534, 539, 182 P.3d 426 (2008).
[23] State v. Diluzio, 162 Wn. App. 585, 590, 254 P.3d 218 (2011) (alteration in original) (quoting Terry, 392 U.S. at 21).
[24] Illinois v. Wardlow, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000).
[25] 162 Wn. App. at 593.

8

with a woman who then got into the passenger's seat.[26] The officer saw no money change hands and did not overhear any conversation between the driver and the woman, neither of whom was known to be involved in prostitution or solicitation activities. This court concluded that the totality of the circumstances did not support a reasonable suspicion of criminal activity.[27] This court further concluded that the trial court should have granted Diluzio's motion to suppress and reversed his convictions.

There are several important distinctions in this case. Before they saw the interaction between Z.B. and Zaldivar-Guillen, the officers here observed specific behavior which led them to suspect that Z.B. was seeking to engage in prostitution. The officers then saw Zaldivar-Guillen interact with Z.B. in a manner consistent with patronizing a prostitute. Then, the officers followed Zaldivar-Guillen's truck to a dark and secluded parking lot in front of a closed business that is a "common area for Johns and prostitutes to go." Contrary to his argument, the record does not indicate that Zaldivar-Guillen was detained merely because of proximity to Z.B., who was suspected of criminal activity.[28] Zaldivar-Guillen's specific conduct, observed by the officers, gave rise to a reasonable suspicion that he was also involved in criminal activity.

On this record, Zaldivar-Guillen fails to establish that the trial court would have granted a motion to suppress. He fails, therefore, to demonstrate that his

---

[26] Id.

[27] Id.

[28] See State v. Richardson, 64 Wn. App. 693, 697, 825 P.2d 754 (1992) (investigative detention unlawful where at the time of the stop officer knew only that defendant was in a high crime area, late at night, walking near a person suspected of drug activity).

9

counsel was deficient. Thus, we need not decide whether he suffered any resulting prejudice.

## SUFFICIENCY OF THE EVIDENCE

Finally, Zaldivar-Guillen contends there was insufficient evidence to support the jury's verdict because there was no evidence tending to show that he and Z.B. discussed sexual contact in exchange for money.

To convict Zaldivar-Guillen of the crime of commercial sexual abuse of a minor as charged under RCW 9.68A.100(1), the State had to prove that he solicited, offered, or requested Z.B. to engage in sexual conduct with him in return for a fee.

Evidence is sufficient to support a conviction if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.[29] A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence.[30] Circumstantial evidence and direct evidence are equally reliable.[31]

Zaldivar-Guillen claims the evidence is insufficient because Z.B. said they did not discuss sex and Zaldivar-Guillen never offered her money. He also points out that it is not "unlawful to have cash in one's vehicle while driving in the company of a prostitute." But while Z.B. did deny that Zaldivar-Guillen offered her money in exchange for sex, the jury was not required to believe her, especially in light of her admission that her statements to police officers at the

---

[29] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).
[30] Id.
[31] State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

time were inconsistent with her trial testimony.[32]  The jury was also free to disbelieve Zaldivar-Guillen's explanation that it was merely coincidental that he had money on the dash just after he had just picked up a prostitute and driven her to a dark and deserted location.  The evidence was sufficient to give rise to a reasonable inference that Zaldivar-Guillen solicited Z.B. to have sexual contact with him for a fee and was therefore, sufficient to support his conviction

We affirm the judgment and sentence.

_Cox, J._

WE CONCUR:

---

[32] State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990) (credibility determinations are for the trier of fact and unreviewable on appeal).