**FILED**
**MAY 30, 2019**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 35932-8-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ERIC SHANE BUCK, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — Eric Buck appeals his conviction for the crime of

identity theft in the second degree. We affirm his conviction but remand for resentencing

because the trial court exceeded its authority when it imposed a sentence beyond the

statutory maximum and when it imposed the deoxyribonucleic (DNA) collection fee.

FACTS

The State charged Mr. Buck with second degree identity theft and third degree

possession of stolen property. Prior to trial, Mr. Buck unsuccessfully sought to suppress

the evidence. He does not assign error to any of the trial court's factual findings from the

suppression hearing. Therefore, those findings are verities on appeal. *State v. O'Neill*,

148 Wn.2d 564, 571, 62 P.3d 489 (2003). We summarize those findings below.

On October 31, 2016, at 10:30 p.m., Spokane Sheriff Deputy Brent Miller drove past the Rosauers grocery store on Division Street in Spokane, Washington. He noticed a unique truck in the Rosauers parking lot next to a Goodwill Industries donation trailer. Deputy Miller knew that the Goodwill donation trailer closed at 6:00 p.m. and was not staffed after that time. He also knew that the Goodwill donation trailer had experienced thefts in the evening after the trailer closed and that Goodwill wished to prosecute the thefts.

Two hours later, Deputy Miller again drove past the Rosauers parking lot. He saw the same unique truck in the Rosauers parking lot, but he noticed it had moved from the Goodwill trailer to a donation shed not affiliated with Goodwill. As he approached the truck in his marked patrol car, the truck's driver attempted to drive away. Deputy Miller parked his patrol car in front of the truck to prevent this. The detention eventually resulted in Deputy Miller obtaining probable cause to arrest the driver, Mr. Buck, on suspicion of presenting false identification and possession of stolen property.

Based on its findings, the trial court concluded that Deputy Miller had a reasonable suspicion that Mr. Buck was engaging in criminal activity and denied Mr. Buck's motion to suppress.

2

The matter proceeded to a jury trial. The jury found Mr. Buck guilty of second degree identity theft, a class C felony, but not guilty of third degree possession of stolen property. The trial court sentenced Mr. Buck to 50 months' confinement and 12 months of community custody—a total of 62 months. The trial court also imposed a $100 DNA collection fee.

Mr. Buck timely appeals.

ANALYSIS

A.   THE ARRESTING DEPUTY LAWFULLY DETAINED MR. BUCK

Mr. Buck first argues the trial court erred when it denied his motion to suppress. The constitutionality of a warrantless stop is a question of law that we review de novo. *State v. Gatewood*, 163 Wn.2d 534, 539, 182 P.3d 426 (2008).

Under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution, an officer generally may not seize a person without a warrant. "As a general rule, warrantless searches and seizures are per se unreasonable, in violation of the Fourth Amendment and article I, section 7 of the Washington State Constitution." *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). "There are, however, a few 'jealously and carefully drawn exceptions' to the warrant requirement which provide for those cases where the societal costs of obtaining a

3

warrant . . . outweigh the reasons for prior recourse to a neutral magistrate." *State v. Williams*, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984) (internal quotation marks omitted) (quoting *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980)). The State must establish by clear and convincing evidence that the search falls within one of the narrowly drawn exceptions. *State v. Garvin*, 166 Wn.2d 242, 250, 207 P.3d 1266 (2009). One such exception is the *Terry*[1] investigative stop. *Id.* at 249-50.

In a *Terry* stop, a police officer may briefly stop and detain an individual without a warrant if the officer reasonably suspects the person is engaged in or about to be engaged in criminal conduct. *Garvin*, 166 Wn.2d at 250. For the *Terry* stop to be valid, the officer must have a reasonable suspicion of criminal activity based on specific and articulable facts known to the officer at the inception of the stop. *State v. Weyand*, 188 Wn.2d 804, 811, 399 P.3d 530 (2017). To evaluate the reasonableness of the officer's suspicion, we look at the totality of the circumstances known to the officer including: the officer's training and experience, the location of the stop, the conduct of the person detained, the purpose of the stop, and the amount of physical intrusion on the suspect's liberty. *Id.* at 811-12.

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

In *Weyand*, the arresting officer saw a car parked near 95 Cullum Avenue, Richland, Washington, that had not been there 20 minutes earlier. *Id.* at 807. He ran the license plate and it revealed nothing of consequence. *Id.* The officer parked his car and saw Wesley Weyand and a friend leave 95 Cullum Avenue. *Id.* As the men walked quickly toward the car, they looked up and down the street. *Id.* The driver looked around a second time before getting into the car. *Id.* Weyand got in the passenger seat. *Id.* Based on these observations and the officer's knowledge of the extensive drug history of the home Weyand had exited, he conducted a *Terry* stop. *Id.* The Washington Supreme Court held that the late night, short stay at the known drug house and the defendant's glances up and down the street did not justify a *Terry* stop. *Id.* at 812.

In *State v. Fuentes*, 183 Wn.2d 149, 352 P.3d 152 (2015), the Washington Supreme Court resolved two consolidated cases involving suspects who visited apartments occupied by suspected drug dealers in high crime neighborhoods. In the first case, *State v. Sandoz*, No. 69913-0-1 (Wash Ct. App. Apr. 21, 2014) (unpublished), http://www.courts.wa.gov/opinions/index.cfm?fa=opinions.showOpinion&filename=699 130MAJ, *overruled by Fuentes*, 183 Wn.2d 149, the following facts preceded the *Terry* stop:

> (1) the officer knew the area had extremely high drug activity based on 911 calls and drug dealing investigations, (2) the officer knew that the apartment Sandoz exited belonged to Ms. Meadows, who had numerous drug-related convictions, including possession with intent to deliver, (3) the officer had express authority from the complex owner to trespass nonoccupants for "loitering" at the complex, (4) the [vehicle in which Sandoz was riding] did not belong to any of the tenants at the complex, (5) the driver of the [vehicle] slouched down when the officer drove past, . . . [and] (7) Sandoz looked surprised when he saw the officer . . . .

*Fuentes*, 183 Wn.2d at 155. The court held that these facts were insufficient to justify a

*Terry* stop. *Id.* at 159.

In the second case, *Fuentes*, law enforcement surveilled an apartment of a known

drug dealer. 183 Wn.2d at 156. During the two hours of surveillance, police saw

approximately 10 people enter the apartment and stay between 5 and 20 minutes. *Id.*

Marisa Fuentes parked her car across the street from the apartment, entered, stayed for

about 5 minutes, and returned to her car. *Id.* She then removed a plastic bag from the

trunk—about the size of a small football—reentered the apartment, and returned to her

car with a bag that had noticeably less content than before. *Id.* at 157. Police then

stopped her car on suspicion of narcotics activity. *Id.* Under the totality of these

circumstances, the Washington Supreme Court held that law enforcement had reasonable

suspicion of criminal activity. *Id.* at 161. The court reasoned that the suspicion of drug

delivery was sufficiently particularized given that the officers observed approximately 10

short-stay visits at an apartment with known drug use, followed by Ms. Fuentes's short stay and apparent delivery of the contents of the plastic bag. *Id.* at 162-63.

The rule from these cases is, to detain a person, an officer needs more than a generalized suspicion the person has engaged in criminal activity. There must be specific and articulable facts that are individualized to the person the police seek to stop. *Terry*, 392 U.S. at 21.

In the present case, Deputy Miller knew that people were taking items from Goodwill's donation trailer after the trailer closed at 6:00 p.m. Deputy Miller noticed a unique truck parked in the lot near the donation trailer at 10:30 p.m. Two hours later, he noticed the same truck in the lot but at a donation shed not affiliated with Goodwill. At that point, Deputy Miller had specific and articulable facts that someone associated with the truck was taking items as people dropped their donations off at the trailer or the shed. This would explain why the truck remained in the parking lot for two hours and moved from the trailer to the shed.

Mr. Buck argues the evidence was as consistent with innocent behavior as criminal behavior. He argues he could have merely left items at the Goodwill trailer at 10:30 p.m. and then returned at 12:30 a.m. and left additional items at the unaffiliated donation shed. We find this highly improbable. It is very unlikely that a person would make two separate

7

trips to donate items so late at night. In addition, "officers do not need to rule out all possibilities of innocent behavior before they make a stop." *Fuentes*, 183 Wn.2d at 163. The movement of the truck between the stations and the length of time the truck almost certainly remained at the lot were much more consistent with a person taking items as they were brought to the locations, as opposed to innocent activity. *State v. Thierry*, 60 Wn. App. 445, 448, 803 P.2d 844 (1991) (reasonable suspicion to warrant *Terry* stop requires an officer to observe behavior more consistent with criminal activity than innocent activity).

We conclude that Deputy Miller's detention of Mr. Buck was based on specific and articulable facts that were individualized to Mr. Buck. These facts were much more consistent with criminal activity than innocent activity. We, therefore, uphold the trial court's conclusion that the stop was lawful and supported by a reasonable suspicion of criminal activity.

B.    THE TRIAL COURT ERRED BY IMPOSING AN UNLAWFUL SENTENCE

Mr. Buck argues his sentence exceeded the maximum sentence permitted for a class C felony. He also argues the trial court erred by imposing the DNA collection fee.

*1.     The sentence term was unlawful*

A trial court may not impose a sentence of confinement and community custody that, when combined, exceeds the statutory maximum for the offense. *State v. Boyd*, 174 Wn.2d 470, 472, 275 P.3d 321 (2012). Here, Mr. Buck was sentenced to 50 months' confinement and 12 months of community custody—a total of 62 months. The State acknowledges that Mr. Buck's sentence exceeds the statutory maximum. Accordingly, we remand to have the trial court reduce the community custody term or for resentencing within the statutory maximum. *Id.* at 473.

*2.     The DNA collection fee must be struck*

Mr. Buck asks this court to strike his DNA collection fee. In *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018), our high court held that recent legislative changes to a court's ability to impose mandatory legal financial obligations applied to cases on direct appeal. The trial court did not have the benefit of *Ramirez* when it imposed its sentence.

Mr. Buck argues these recent legislative changes prohibit the trial court from imposing the DNA collection fee against him. The State, noting Mr. Buck's extensive history of felony convictions, agrees. So do we.

No. 35932-8-III
*State v. Buck*

In summary, we affirm the trial court's denial of Mr. Buck's suppression motion and his subsequent conviction. But we remand for imposition of a lawful sentence and to strike the DNA collection fee.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, C.J.

I CONCUR:

Pennell, J.

10

No. 35932-8-III

FEARING, J. (dissenting) — Although the two decisions address diverging facts from this appeal, I conclude, based on *State v. Weyand*, 188 Wn.2d 804, 399 P.3d 530 (2017) and *State v. Fuentes*, 183 Wn.2d 149, 352 P.3d 152 (2015), that Sheriff Deputy Brent Miller lacked reasonable articulated suspicion of criminal activity to detain Eric Buck and Buck's vehicle. Therefore, I dissent.

_____
Fearing, J.